**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| THE OHIO HOUSE, LLC, | No.22-56181 |
| *Plaintiff-Appellant*, | D.C. No. 8:19-cv-0171f0-JVS-GJS |
| v. | |
| CITY OF COSTA MESA, a municipal corporation, | OPINION |
| *Defendant-Appellee*, | |
| and | |
| BRANDON STUMP, an individual; RYAN STUMP, an individual; KEITH STUMP, an individual; BUCKEYE RECOVERY TREE COLLECTIVE, LLC, a California limited liability company; BUCKEYE TREE COLLECTIVE, LLC, a California limited liability company; CHADWICK HOUSE, LLC, a California limited liability company; ASHBROOKE, LLC, an Ohio limited liability company, | |
| *Counter-Defendants*. | |

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted March 29, 2024
Pasadena, California

Filed December 4, 2024

Before:  Ronald M. Gould, Sandra S. Ikuta, and Danielle J.
Forrest, Circuit Judges.

Opinion by Judge Forrest;
Special Concurrence by Judge Ikuta;
Concurrence by Judge Forrest;
Partial Dissent by Judge Gould

## SUMMARY[*]

### Fair Housing Discrimination

The panel affirmed the district court's partial summary
judgment to the City of Costa Mesa and denial of The Ohio
House LLC's post-verdict motions in Ohio House's action
challenging the City's zoning laws as discriminatory against
the disabled in violation of the Fair Housing Act (FHA),
California's Fair Employment and Housing Act (FEHA),

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

and the California Planning and Zoning Law, California Government Code § 65008.

Ohio House operates a sober-living facility in a multiple-family residential (MFR) zone. The City notified Ohio House that the property was subject to Ordinance 15-11, which requires that all group homes with over six residents located in MFR zones obtain a conditional-use permit and satisfy a separation requirement. The City denied Ohio House's application for a conditional-use permit because the property did not meet the separation requirement, and also denied Ohio House's request for a reasonable accommodation or waiver of the separation requirement.

Addressing Ohio House's disparate treatment claim, the panel agreed with the parties that whether the City's zoning code facially subjects the disabled to unlawful disparate treatment is a question of law that should have been resolved at summary judgment. On the merits, the panel held that Ohio House failed to establish facial disparate treatment as a matter of law because the differential treatment under the City's group-living regulations facially benefits the protected class of disabled people. The district court's error in submitting this matter to the jury was harmless because the jury correctly concluded that Ohio House failed to prove disparate treatment.

The panel affirmed the district court's summary judgment for the City on Ohio House's disparate impact claim, agreeing with the district court that Ohio House failed to prove a significant, adverse, and disproportionate effect on a protected group.

The panel affirmed the district court's denial of judgment as a matter of law on Ohio House's discriminatory statements claim. Ohio House's contention that the City

violated the FHA's and the FEHA's prohibition against discriminatory statements by enacting a facially discriminatory zoning code fails for the same reasons that the disparate treatment claim fails. Comments made by individual city employees suggesting that they had a discriminatory purpose for adopting the challenged zoning regulations are, standing alone, insufficient to overturn the jury's verdict.

The panel affirmed the district court's denial of judgment as a matter of law on Ohio House's claim that the City interfered with Ohio House aiding or encouraging others' exercise of their rights under the FHA because Ohio House failed to prove a causal link between its protected activity of providing sober-living housing and the City's actions that impeded that activity. The panel adopted the Seventh Circuit's approach to causation, which requires proof of intentional discrimination or discriminatory animus to establish a prima facie claim based on an interference theory.

The panel affirmed the district court's denial of judgment as a matter of law on Ohio House's facial challenge to the City's reasonable-accommodation ordinance, concluding that (1) the City's reasonable-accommodations ordinance is not facially inconsistent with the FHA; and (2) the jury had an evidentiary basis for finding that Ohio House's requested accommodation—granting an exception to the separation requirement—was unreasonable. Because the jury ultimately reached the correct outcome, it was harmless error for the district court to submit this purely legal issue to the jury.

Finally, the panel affirmed the district court's denial of Ohio House's post-trial renewed motion for judgment as a

matter of law on Ohio House's § 65008 claim because it was time-barred.

Specially concurring, Judge Ikuta would hold that to establish a facial disparate treatment claim under the FHA and FEHA, a plaintiff must show that the protected group suffered *unfavorable* treatment compared to the unprotected group and not merely show that the protected group has been treated *differently* than the unprotected group.

Concurring, Judge Forrest agreed with Judge Ikuta that a plaintiff should be required to prove adverse facially differential treatment as part of its prima facie case, but disagreed that a prima facie showing of *unfavorable* treatment is required under Ninth Circuit precedent.

Dissenting in part, Judge Gould would have dismissed Ohio House's interference claim under the FHA as waived for lack of adequate briefing, instead of reaching the merits.

## COUNSEL

Christopher Brancart (argued) and Elizabeth Brancart, Brancart & Brancart, Pescadero, California, for Plaintiff-Appellant.

Mary-Christine Sungaila (argued), Charles M. Kagay, Jocelyn Sperling, and Greg Wolff, Complex Appellate Litigation Group LLP, Newport Beach, California; Kimberly H. Barlow, Jones & Mayer, Fullerton, California; Samantha E. Dorey, Seymour B. Everett, and Christopher D. Lee, Everett Dorey LLP, Irvine, California; for Defendant-Appellee.

Norman A. Dupont, Patrick K. Bobko, Jay A. Tufano, and Sage Ertman, Ring Bender LLP, Westlake Village, California, for Amicus Curiae League of California Cities.

Lisa C. Ehrlich and Kenneth J. Sugarman, Deputy Attorneys General; Christina B. Arendt and James F. Zahradka II, Supervising Deputy Attorneys General; Michael L. Newman and Daniel A. Olivas, Senior Assistant Attorneys General; Rob Bonta, Attorney General of California; Office of the California Attorney General, San Francisco, California; for Amici Curiae California Civil Rights Department and the California Department of Housing and Community Development.

**OPINION**

FORREST, Circuit Judge:

Plaintiff-Appellant The Ohio House, LLC operates a sober-living home located in Costa Mesa, California (City) for individuals recovering from addiction. In this case, Ohio House challenges the City's zoning laws as discriminatory against the disabled in violation of the Fair Housing Act (FHA), codified as amended by the Fair Housing Act Amendments of 1988 at 42 U.S.C. § 3601 *et seq.*; California's Fair Employment and Housing Act (FEHA); and the California Planning and Zoning Law, California Government Code § 65008.

In recent years, the City has changed its regulations governing the ability of group-living facilities to operate in residential zones. Some such facilities are categorically barred from operating in these zones, and others that provide housing for individuals with a disability recognized under federal or state law may operate if they meet certain conditions, including a separation requirement from other such facilities. Ohio House cannot operate its facility under the City's current zoning regulations because it cannot satisfy the separation requirement, and the City denied Ohio House a variance from this requirement, which Ohio House had requested as an accommodation. Thus, Ohio House brought this action to enjoin enforcement of the City's zoning requirements based on the above troika of fair-housing laws, advancing multiple theories of disability discrimination. The district court granted partial summary judgment to the City, and a jury returned a verdict in favor of the City on Ohio House's remaining claims. After the

jury's verdict, the district court denied Ohio House's motions for judgment as a matter of law and for a new trial.

On appeal, Ohio House challenges the district court's summary judgment and post-verdict rulings. We affirm.

## I.    BACKGROUND

### A.  Costa Mesa's Zoning Ordinances

Costa Mesa regulates zoning "to promote the public health, safety, general welfare and [to] preserve and enhance the aesthetic quality of the city by providing regulations to ensure that an appropriate mix of land uses occur in an orderly manner." Costa Mesa Municipal Code (CMMC) § 13-2. Part of the zoning code regulates group-living facilities. Originally, these types of facilities were loosely defined. For example, from at least 2000 until 2014, "[g]roup home" was defined as "[a] residential facility designed or used for occupancy by persons that do not constitute a family." A small boardinghouse was defined as "[a] dwelling which is designed or used to accommodate a maximum of 3 guests, where guestrooms are provided in exchange for an agreed payment of a fixed amount of money or other compensation based on the period of occupancy." And a large boardinghouse was defined as "[a] dwelling which has all of the characteristics of a small boardinghouse and which accommodates 4 or more guests . . . [and] includes, but is not limited to, a residence for a sorority or fraternity." "Sober living home" was not originally a defined category. The regulations allowed the City Council to adopt standards to evaluate "group home applications," but the record on appeal is unclear about how much these facilities were regulated.

Beginning in 2014, the City expanded its zoning code and enacted new rules governing group-living facilities, including, relevant here, group housing for disabled persons, CMMC §§ 13-310 to -312; *Socal Recovery, LLC v. City of Costa Mesa*, 56 F.4th 802, 806 (9th Cir. 2023), which includes "persons recovering from drug and/or alcohol addiction," *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1156–57 (9th Cir. 2013). In the City's view, federal and state legislation had incentivized a "significant increase in the number of single- and multi-family homes being utilized as alcohol and drug recovery facilities for large numbers of individuals," which led to "overconcentration" of sober living homes in residential communities.[1] The City concluded this produced "deleterious" effects "to the residential character" of its communities and "generated secondary impacts including, but not limited to neighborhood parking shortfalls, overcrowding, inordinate amounts of second-hand smoke, and noise; and the clustering of sober living facilities in close proximity to each other creating near neighborhoods of sober living homes." It was also concerned that these changes increased "institutionalization," harming the very people sober living homes were supposed to serve:

> [H]ousing inordinately large numbers of unrelated adults in a single dwelling or congregating sober living homes in close proximity to each other does not provide the handicapped with an opportunity to "live in

---

[1] The City largely tied the increased number of group homes to the 2000 California Substance Abuse and Crime Prevention Act, which allowed for diversion from incarceration for treatment, and the federal Affordable Care Act, which expanded coverage for substance-abuse treatment.

> normal residential surroundings," but rather
> places them into living environments bearing
> more in common with the types of
> institutional/campus/dormitory living that
> the FEHA and [FHA] were designed to
> provide relief from for the handicapped, and
> which no reasonable person could contend
> provides a life in a normal residential
> surrounding.

By regulating group housing for the disabled, the City was
"attempting to strike a balance between the City's and
residents' interests of preserving the characteristics of
residential neighborhoods and to provide opportunities for
the handicapped to reside in such neighborhoods that are
enjoyed by the non-handicapped."

Ordinance 14-13 established the framework for the
City's comprehensive plan to address "overconcentration"
and "institutionalization" and amended the definitions for
group housing. CMMC §§ 13-310 to -312. Under the new
regulatory scheme, "group home," is defined as a "facility
that is being used as a supportive living environment for
persons who are considered handicapped under state or
federal law," and "boardinghouse" is defined as "[a]
residence or dwelling, other than a hotel, wherein rooms are
rented under two (2) or more separate written or oral rental
agreements, leases or subleases or combination thereof,
whether or not the owner, agent or rental manager resides
within the residence." *Id.* § 13-6.[2] Ordinance 14-13 also

---

[2] The new ordinance also distinguished between small boarding houses:
"two (2) or fewer rooms being rented," and large boardinghouses: "three
(3) to six (6) rooms being rented." *Id.*

created the "[s]ober living home" category, defined as "a group home for persons who are recovering from a drug and/or alcohol addiction and who are considered handicapped under state or federal law." *Id.* § 13-6; *Socal Recovery*, 56 F.4th at 806.

The 2014 regulations also imposed new substantive requirements for group homes located in single-family zoning districts (R1 zones). Boardinghouses—both small and large—are categorically prohibited from operating in R1 zones. CMMC § 13-30 (Costa Mesa Land Use Matrix). Group homes, including sober-living homes, with more than six residents are prohibited in R1 zones. *Id.* § 13-312. Group homes with six or fewer residents may operate in R1 zones if they obtain a special-use permit. *Id.* § 13-311. Sober-living homes must also obtain a special-use permit and comply with a separation requirement. *Id.* § 13-311(a)(14)(i). The separation requirement mandates that sober-living homes be spaced at least 650 feet apart, "as measured from the closest property lines, of any other sober living home or a state licensed alcoholism or drug abuse recovery or treatment facility." *Id.*

In 2015, the City enacted new regulations governing multi-family residential districts (MFR zones). *Id.* §§ 13-322 to -324. Ordinance 15-11 requires that all group homes with six or fewer residents located in MFR zones, including sober-living homes, obtain a special-use permit and satisfy the separation requirement. *Id.* § 13-322(a). Group homes with over six occupants in MFR zones must obtain a conditional-use permit. *Id.* § 13-323. A conditional-use permit may be granted only if the separation requirement is satisfied "unless the reviewing authority determines that such location will not result in an over-concentration of similar uses." *Id.* § 13-323(b). A group-home operator

applying for a conditional-use permit must also obtain an operator's permit. *Id.* § 13-323(c).

Ordinance 15-11 imposes different rules for boardinghouses located in MFR zones. Small boardinghouses, with two rooms or fewer, do not require a permit but must be located at least 650 feet from any other small boardinghouse. CMMC § 13-30 (table n.7). Large boardinghouses, with three to six rooms, must be separated from *any* other boardinghouse by at least 1,000 feet and must obtain a conditional-use permit. But unlike group homes, they need not obtain an operator's permit to qualify for a conditional-use permit. *Id.*

Ordinance 15-11 and its companion ordinance, Ordinance 15-13, apply retroactively to group homes. Pre-existing facilities had a year to obtain a conditional-use permit and 120 days to obtain an operator's permit from the effective date of the ordinances (December 17, 2015). *Id.* § 13-324. The regulations do not apply retroactively to boardinghouses. *See generally id.*

The City passed additional ordinances in 2017, Ordinances 17-05 and 17-06, that altered the application requirements for group homes and provided revised procedures for seeking reasonable accommodations.

## B. The Ohio House, LLC

Ohio House operates a structured men's sober-living facility at 115 East Wilson Street (Wilson Property). The Wilson Property is in a MFR zone, specifically a Multiple-Family Residential, Medium Density zone, that is designated "Commercial Residential." This property consists of five 2400-square-foot, two-story detached units, each with four bedrooms, outdoor space, a garage, and a parking area. Each

of the five units houses six to eight residents for a total of approximately 45 residents, including a house manager.

The Wilson Property began offering services and housing to men in substance-abuse recovery in 2012. Most residents moved to the Wilson Property after completing a substance-abuse treatment program. Residents must agree to rules designed to promote recovery to live independently without relapse. Residents spend an average of seven months living at Ohio House.

### C. The City's Code Enforcement

In March 2016, City authorities investigated the Wilson Property and noted that it was "a Group Home serving 7 or more in the R2 zone and is subject to Ord. 15-11." Within a week, the City notified Ohio House that the property was subject to Ordinance 15-11. *Id.* Ohio House applied for a conditional-use permit and an operator's permit, as required, but its application was denied because the Wilson Property is located 550 feet from another sober living home that had already obtained a conditional use-permit. In fact, there were four other group homes within 650 feet of the Wilson Property—the licensed sober living home, two state-licensed treatment facilities, and an un-permitted facility against which the City was pursuing enforcement.

In September 2017, Ohio House requested a reasonable accommodation or a waiver of the separation requirement, but the City's Economic and Development Services Director denied these requests. Among other considerations, the Director noted that not requiring Ohio House to comply with the separation requirement would fundamentally alter the City's zoning program. Ohio House appealed this denial to the City's Planning Commission and stated at a public hearing that it would cap occupancy at the Wilson Property

to six residents per unit as a condition of receiving a conditional-use permit. The Planning Commission upheld the denial of Ohio House's permit application.

Ohio House then appealed to the City Council, reiterating its willingness to reduce occupancy to six residents per unit. In August 2019, the City Council also upheld the denial of a conditional-use permit and ordered the Wilson Property to cease operations by September 8, 2019. The City also imposed numerous fines against the Wilson Property, totaling approximately $29,000.

### D. Ohio House's Lawsuit

Ohio House sued the City for unlawful discrimination against residents at the Wilson Property in violation of the FHA, the FEHA, and California Government Code § 65008. Specifically, Ohio House argued that provisions of the City's zoning code enacted under Ordinances 15-11, 15-13, 17-05, and 17-06: (1) discriminated against the disabled (disparate-treatment claim), (2) disparately impacted the disabled (disparate-impact claim), (3) stated a discriminatory preference disfavoring the disabled (discriminatory-statements claim), (4) interfered with Ohio House's operations because it aids and encourages the disabled in exercising their fair-housing rights (interference claim), (5) improperly disallowed reasonable accommodation for the disabled (reasonable-accommodation claim), and (6) violated California Government Code § 65008.

After discovery, the parties cross moved for summary judgment. The district court granted the City's motion on Ohio House's disparate-impact claims but otherwise denied both motions. The remaining claims were then tried to a jury. Before the case was submitted to the jury, the parties each moved for judgment as a matter of law under Federal Rule

of Civil Procedure 50(a). The district court orally denied these motions, except that the district court reserved ruling on whether Ohio House's California Government Code § 65008 claim was untimely.

The jury found that the City had not violated the FHA or the FEHA. Thereafter, the district court issued findings and conclusions related to Ohio House's California Government Code § 65008 claim, concluding that this claim was untimely and that judgment in favor of Ohio House would be inconsistent with the jury's findings. Thus, the district court entered judgment in favor of the City on all claims.

Several weeks later, Ohio House renewed its motion for judgment as a matter of law and, alternatively, moved for a new trial. Ohio House also requested that the district court take judicial notice of various documents, including letters from the California Department of Housing and Community Development, excerpts from the City's "Housing Element Update," and a notice of public hearing. The district court denied Ohio House's motions but granted its request for judicial notice insofar as the district court relied on the subject documents. Ohio House timely appealed.

## II.    DISCUSSION

Ohio House's primary claims fall under overlapping provisions of the FHA and the FEHA. We begin with those claims and then address Ohio House's claim under California Government Code § 65008.

### A.    FHA/FEHA Claims

It is unlawful under the FHA "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap . . . ." 42 U.S.C. § 3604(f)(1). A municipality violates this law if

its "zoning practices . . . discriminate against disabled individuals . . . [and] contribute to 'mak[ing] unavailable or deny[ing]' housing to those persons." *Pac. Shores Props., LLC*, 730 F.3d at 1157 (second and third alterations in original) (quoting 42 U.S.C. § 3604(f)(1)); *see also Socal Recovery*, 56 F.4th at 814 ("[L]ocal governments are prohibited from discriminating *on the basis of disability* through zoning and land use practices."). The FEHA largely mirrors its federal counterpart. *See* Cal. Gov't Code § 12927(c)(1) (tracking the FHA's definition of "discrimination"); *id.* § 12955(k) (recognizing overlapping protected classes as the FHA); *id.* § 12955.6 (guaranteeing no "fewer rights or remedies than the [FHA]"). The FEHA prohibits discrimination based on disability "through public or private land use practices, decisions, and authorizations." *Id*. § 12955(l). We analyze FHA and FEHA claims under the same standard. *Socal Recovery*, 56 F.4th at 811; *see also Pac. Shores Props.*, 730 F.3d at 1156 n.14.

"[P]ersons recovering from drug and/or alcohol addiction are disabled under the FHA and [are] therefore protected from housing discrimination." *Pac. Shores Props.*, 730 F.3d at 1156–57. Group homes operated for persons recovering from addiction, often referred to as sober-living homes, are covered "dwellings." *Id.* Therefore, both federal and California law "prohibit[] discriminatory actions that adversely affect the availability of such . . . homes." *Id.* Sober-living-home operators are "aggrieved" by unlawful zoning practices that prevent them from carrying out normal business operations, and they may sue to "invalidate any state or local law that 'purports to require or permit' an action that would be a discriminatory housing practice" without having to prove the individual disability status of their residents. *Socal Recovery*, 56 F.4th at 814; *see also* Cal.

Gov't Code § 12927(g) (defining "aggrieved" parties that may sue under the FEHA). Thus, Ohio House is a proper plaintiff in this case.

### 1.  Disparate Treatment

Ohio House first argues that the City's zoning code is facially discriminatory because it imposes different requirements on group homes than other group-living facilities that are not defined in relation to disability status, namely boardinghouses. Ohio House further contends that to prevail on its disparate-treatment claim based on a facial-discrimination theory, it need only prove facially different treatment, which is a purely legal question that should have been resolved at summary judgment. Alternatively, Ohio House argues that the City's regulations do not benefit the disabled because they pose greater burdens on group homes than boardinghouses.

### a.  Legal Standard

Disparate treatment is synonymous with intentional discrimination. *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Thus, to prevail on this claim a "plaintiff must establish that the defendant had a discriminatory *intent or motive*." *Tex. Dep't of Hous. & Community Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 524 (2015) (emphasis added) (quoting *Ricci*, 557 U.S. at 577). There are multiple ways to prove such intent. *Morris v. W. Hayden Ests. First Addition Homeowners Ass'n, Inc.*, 104 F.4th 1128, 1139–40 (9th Cir. 2024).

First, a plaintiff may rely on the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). This analysis applies "where the evidence [of discrimination] is indirect" and the plaintiff is

18    THE OHIO HOUSE, LLC V. CITY OF COSTA MESA

"challenging as pretextual a facially neutral explanation for the challenged action." *Morris*, 104 F.4th at 1140; *see also Pac. Shores Props.*, 730 F.3d at 1158.

Second, a plaintiff may prove disparate treatment with "'direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated' the defendant and that the defendant's actions adversely affected the plaintiff in some way." *Pac. Shores Props.*, 730 F.3d at 1158 (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004)). The discriminatory purpose need not be the defendant's "sole purpose" for taking the challenged action, but it must have been "a 'motivating factor.'" *Morris*, 104 F.4th at 1140 (emphasis removed) (quoting *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016)). Under this standard, we employ "the 'sensitive' multi-factor inquiry articulated by the Supreme Court in *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 266 (1977), to determine whether the plaintiff[] ha[s] created a triable issue of fact that the defendant's actions were motivated by discriminatory intent." *Pac. Shores Props.*, 730 F.3d at 1158.

Finally, relevant here, we have held that a plaintiff may prove disparate treatment through "[a] facially discriminatory policy [that] on its face applies less favorably to a protected group." *Community House, Inc. v. City of Boise*, 490 F.3d 1041, 1048 (9th Cir. 2007). In this context, we have held that *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Johnson Controls, Inc.*, 499 U.S. 187 (1991), governs. *Community House, Inc.*, 490 F.3d at 1049. Under *Johnson Controls*, a disparate-treatment claim based on a facially discriminatory policy "does not depend on why the [defendant] discriminates but rather on the explicit terms of

the discrimination." 499 U.S. at 199. We adopted the following burden-shifting framework: The plaintiff has the initial burden to make a prima facie "showing that a protected group has been subjected to explicitly differential—i.e., discriminatory—treatment," and then the burden shifts to the defendant to "show either: (1) that the [challenged] restriction benefits the protected class or (2) that it responds to legitimate safety concerns raised by the individuals affected, rather than being based on stereotypes." *Community House*, 490 F.3d at 1050.

### b. Ohio House's Procedural Argument

We agree with the parties that whether the City's zoning code facially subjects the disabled to unlawful disparate treatment is a question of law that should have been resolved at summary judgment. *See In re York*, 78 F.4th 1074, 1088 (9th Cir. 2023) ("Given Rule 56's mandatory language, if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law, the court lacks 'discretion' to insist that, in defiance of Rule 56, a trial will be held anyway."); *see also Courage to Change Ranches Holding Co. v. El Paso Cnty.*, 73 F.4th 1175, 1191 (10th Cir. 2023) ("[W]hether a zoning ordinance is facially discriminatory is a legal issue that can be discerned from the face of the ordinance[.]").

The district court held that Ohio House established a prima facie case of facially differential treatment as a matter of law. But under *Community House*'s burden-shifting framework, it reserved the question of benefit as a factual issue to be resolved by the jury. That was error. Where, as here, the parties do not dispute any material facts, whether a law facially benefits the protected class is a question of law. *See Caruso v. Yamhill Cnty.*, 422 F.3d 848, 859 (9th Cir.

2005) ("Because the material facts are not in dispute, 'the character and extent of the statute's burden involves a question of law' . . . ." (quoting *Krislov v. Rednour*, 226 F.3d 851, 859 (7th Cir. 2000))). Nonetheless, the district court's error in not resolving this legal issue and submitting the disparate-treatment claim to the jury was harmless if the jury's verdict is consistent with the required legal outcome. *See Minneapolis & Saint Louis Ry. Co. v. Columbus Rolling-Mill Co.*, 119 U.S. 149, 152 (1886) ("The submission of a question of law to the jury is no ground of exception, if they decide it aright."); *Sloman v. Tadlock*, 21 F.3d 1462, 1468–69 (9th Cir. 1994) (where "the factual findings the jury must have made . . . would require the district court to deny [a defendant] qualified immunity" then "even if the court erred in sending the qualified immunity determination to the jury, the error was harmless"). Thus, we consider whether Ohio House established facial disparate treatment as a matter of law.

### c.  Ohio House's Merits Argument

As discussed, we apply a burden-shifting framework to evaluate claims of facial discrimination. *Community House*, 490 F.3d at 1050. Accordingly, we consider whether Ohio House established a prima facie case, whether the City rebutted that case by showing its regulations provide a benefit to the disabled, and—relevant to California law—whether the City employed the least-restrictive means of achieving that benefit.

i.

At summary judgment, the district court concluded that Ohio House established a prima facie showing that the City's zoning regulations facially impose differential treatment because they "treat Group Homes and Sober Living Homes

differently from other dwellings that are not defined by disability." Ohio House echoes this reasoning on appeal: "Because the City limited the definitions of 'group home' and 'sober living home' to housing for persons with disabilities, Ohio House established facial discrimination." *See* CMMC § 13-6.

Under *Community House*'s stated burden-shifting framework, Ohio House is correct. Although *Community House* stated generally that "[a] facially discriminatory policy is one which on its face applies less favorably to a protected group," 490 F.3d at 1048, in defining the steps of its test for determining whether a facial-disparate treatment claim is established under the FHA, it instructed that the first step—the prima-facie case of intentional discrimination—is satisfied "merely by showing that a protected group has been subjected to explicitly *differential*—i.e., discriminatory—treatment," *id.* at 1050 (quoting *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995) (emphasis added). Neither *Community House* nor the cases it relied on for the burden-shifting framework required proof of *unfavorable* treatment at the initial prima-facie stage. *See id.* (citing *Bangerter*, 46 F.3d at 1501, 1503–04; *Larkin v. Mich. Dept. of Soc. Servs.*, 89 F.3d 285, 290 (6th Cir. 1996)) ("[A] plaintiff makes out a prima facie case of intentional discrimination under the [Fair Housing Act] merely by showing that a protected group has been subjected to explicitly differential—i.e. discriminatory—treatment.").[3]

---

[3] Nor is such proof required under the FEHA. Under that statute, a facially discriminatory policy is one "that explicitly conditions a housing opportunity on a protected basis, takes adverse action based on a protected basis, or directs adverse action to be taken based on a protected

ii.

Regardless of its prima-facie showing, Ohio House's disparate-treatment claim fails because the differential treatment imposed under the City's group-living regulations facially "benefits the protected class." *Id.*[4]

At the outset, Ohio House argues that a comparator analysis is inappropriate. This is incorrect. As discussed, all disparate-treatment claims require proof that the defendant acted with discriminatory intent. *Inclusive Communities*, 576 U.S. at 524. In analyzing whether the necessary intent was proven in a facial challenge governed by *Community House*, the defendant must have the opportunity to demonstrate that the *differential* treatment identified by the plaintiff actually benefits the disabled. 490 F.3d at 1050. Otherwise, liability could be imposed for "benign discrimination" ("special restrictions upon the disabled that are really beneficial to, rather than discriminatory against, [disabled persons]," *Courage to Change*, 73 F.4th at 1197 (alteration in original)), which does not evidence discriminatory intent—the ultimate touchstone of disparate

---

basis." 2 C.C.R. § 12040(c); *see also Martinez v. City of Clovis*, 90 Cal.App.5th 193, 270–71 (Jul. 19, 2023) (adopting the burden-shifting framework in 2 C.C.R. §§ 12040–12042 for a FEHA discriminatory effects claim). The disjunctive "or" suggests that, while the two latter items in the list require adverse action, the former does not. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 116 (2012). And, similar to the *Community House* framework, a defendant can avoid liability for a facially discriminatory policy by showing the policy "[o]bjectively benefits a protected class" and "[i]s the least restrictive means of achieving the identified purpose." 2 C.C.R. § 12042(f).

[4] The City does not argue that its zoning code "responds to legitimate safety concerns raised by the individuals affected." *Id.*

treatment. A straightforward way to show benefit is to demonstrate that the challenged regulations treat disabled individuals more favorably than similarly situated nondisabled individuals. *See Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale*, 46 F.4th 1268, 1274 (11th Cir. 2022) ("Because the Zoning Ordinance undeniably treats individuals with disabilities *more favorably* than it treats similarly situated, nondisabled individuals, we conclude that the Zoning Ordinance is not facially discriminatory at all."). Indeed, it is difficult to conceptualize a "benefit" without some baseline for comparison. There may be other ways to demonstrate benefit, even in a facial challenge, but a comparator analysis is certainly a permissible way.

In this case, the City's zoning code benefits the disabled over the nondisabled with regard to group-living facilities. For example, group homes and sober-living homes with six or fewer residents may operate in R1 zones if they meet permitting and separation requirements. *See* CMMC § 13-30. But boardinghouses of any size are categorically barred from operating in R1 zones. *See id.* Of course, group and sober-living homes would receive an even greater benefit if they could operate in R1 zones without meeting any requirements. But *Community House* does not require proof that the defendant's challenged policy provides the protected class with the maximum possible benefit. And Ohio House cannot use certain provisions of the zoning code as a sword while crying foul when the City uses intertwined provisions as a shield. The City's permitting and separation requirements applicable to group homes located in R1 zones impose a burden, but they also give facilities housing the disabled an avenue for operating in these zones that is unavailable under any circumstances to similar group-living

dwellings housing the nondisabled. In this context, the burden imposed is connected to a benefit. And on net, operators and residents of group homes and sober-living homes in R1 zones are facially advantaged over other group-living facilities.

There are other residential zones where group-living facilities for both the disabled and nondisabled may operate. Here, we look to boardinghouses as a relevant comparator to determine if any benefit is conferred on the disabled. *Cf. Gamble*, 104 F.3d at 306–07 (cautioning that a zoning bias against group living should not be mistaken for a bias against the disabled); *Olson v. California*, 104 F.4th 66, 77 (9th Cir. 2024) ("[C]omparator groups 'need not be similar in all respects, but they must be similar in those respects relevant to the Defendants' policy.'" (quoting *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1064 (9th Cir. 2014))). And again, we conclude that the City's regulations facially benefit group homes and sober living homes, if not without conditions.

To start, as a category, boardinghouses are limited to dwellings that house no more than six residents. CMMC § 13-6. Group homes are not subject to this numerical limitation. *See* CMMC § 13-323 (allowing permits to be issued to group and sober-living homes with "seven (7) or more occupants" in MFR zones). Therein lies a benefit for group homes.

Additionally, the City maintains that "boardinghouse" is an inclusive category for all forms of group living. Specifically, in relation to MFR zones, where both group homes and boardinghouses may operate, the City contends that a business offering housing to multiple nondisabled individuals must meet the boardinghouse requirements, while a business offering housing to multiple disabled

individuals has options: It may operate if it meets the boardinghouse requirements *or* if it meets the group or sober living home requirements. Although Ohio House contends this is an implausible reading of the zoning code and "[w]e are not bound by a party's concession as to the meaning of the law," *United States v. Ogles*, 440 F.3d 1095, 1099 (9th Cir. 2006) (en banc), we afford significant weight to a government's narrowing interpretation of its own laws. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 (1992) (accepting Solicitor General's repudiation of governmental authority); *United Transp. Union v. Skinner*, 975 F.2d 1421, 1425 (9th Cir. 1992) (declining to resolve "dispute regarding enforcement" when government agency abandoned contrary interpretation). And we expect that the City will enforce its zoning code in accordance with its representations to the district court and to this court.[5] Because the City's zoning code, as the City interprets it, gives group homes that serve the disabled multiple pathways to operate lawfully—only one of which is open to those not serving the nondisabled— its facial classification benefits the disabled.

Take Ohio House's protest that small boardinghouses (those with two or fewer rooms) do not need a permit to operate, while small group homes (six or fewer occupants)

---

[5] Unlike, say, a state attorney general's interpretation of a criminal statute that may not bind county attorneys enforcing that statute, *Stenberg v. Carhart*, 530 U.S. 914, 941 (2000), there is no separate authority tasked with enforcing the City's zoning ordinances. Nor is the City's interpretation unreasonable. *Contra id.* at 944–45. The ordinances define a boardinghouse as a "dwelling unit, other than a hotel, wherein rooms are rented under two or more separate written or oral rental agreements . . . ." CMMC § 13-6. Nowhere do they say that that a boardinghouse cannot be a multiple dwelling unit that serves the disabled. *See generally id.*

require a special-use permit. If a group home with two or fewer rooms wanted to open without a permit, it could opt into the boardinghouse regulatory scheme.[6] Based on the City's concession, the group and sober-living home regulations operate as a one-way ratchet to broaden the regulatory options for group housing serving the disabled.[7] In situations where the boardinghouse regulations are more favorable, group homes can opt into that scheme. Where group and sober-living home regulations are more favorable, they can make that choice. This choice benefits group and sober-living homes over boardinghouses. For this reason, we conclude that Ohio House's FHA disparate-treatment claim fails.

iii.

The standard under the FEHA is slightly different than under the FHA because proof of a benefit to the protected class does not end the inquiry under California's statute. The FEHA requires that a facially discriminatory policy be the least-restrictive means of achieving its purpose. Cal. Code Regs. tit. 2, § 12042(f)(2). "Although the government bears the burden of proof" in a least-restrictive-means inquiry, "it is under no obligation to dream up alternatives that the plaintiff [itself] has not proposed." *Walker v. Beard*, 789

---

[6] If the small group home had more than two rooms, a small boardinghouse would not be the legally relevant comparator. We would instead look to the regulations for a large boardinghouse.

[7] Even if this one-way ratchet were not the case, Ohio House could not succeed simply by showing that the City's regulations, which generally benefit the protected class, may not benefit it in isolated scenarios, as a facial challenge must show that the law lacks a "plainly legitimate sweep." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

F.3d 1125, 1137 (9th Cir. 2015). Accordingly, we confine our analysis to Ohio House's argument that it would have been less restrictive for the City to enforce its nuisance laws to limit the "secondary effects" arising from group homes than to adopt its revised group-living regulations. It is unclear whether Ohio House envisions nuisance law as an alternative to all zoning laws pertaining to group and sober-living homes, or just some subset. Would nuisance enforcement replace the separation requirement? The permitting scheme? Both?

Regardless, nuisance laws alone could not accomplish the full array of objectives that the City sought to achieve. Take, for example, the City's desire to avoid institutionalization and "ensure that handicapped persons have the opportunity to live in normal residential surroundings and enjoy a dwelling in a manner similar to the way a dwelling is enjoyed by the non-handicapped." Nuisance laws may help combat excessive noise and second-hand smoke, but they would do little to prevent overconcentration of group-living facilities in residential areas. Nuisance laws simply are not an alternative means for ensuring that individuals recovering from substance abuse have an equal opportunity to live in residential rather than institutionalized neighborhoods.

For these reasons, we conclude that the City has rebutted Ohio House's prima facie case of discriminatory intent under the FEHA. And although the district court erred by not deciding Ohio House's disparate-treatment claim under both federal and state law at summary judgment, this was harmless because the jury correctly concluded that Ohio House failed to prove disparate treatment. *See Minneapolis & Saint Louis Ry. Co.*, 119 U.S. at 152.

## 2.    Disparate Impact

Next, Ohio House challenges the district court's grant of summary judgment for the City on the disparate-impact claim.

The disparate-impact theory of discrimination prohibits actions that "create a discriminatory effect upon a protected class or perpetuate housing segregation without any concomitant legitimate reason." *S.W. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 962 (9th Cir. 2021) (quoting *Ave. 6E*, 818 F.3d at 503). These claims "'permit[] plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification.'" *Ave. 6E*, 818 F.3d at 503 (quoting *Inclusive Communities*, 576 U.S. at 540). They "target[] 'artificial, arbitrary, and unnecessary barriers' to minority housing and integration that can occur through unthinking, even if not malignant, policies of developers and governmental entities." *Id.* (quoting *Inclusive Communities*, 576 U.S. at 540). In other words, as previously discussed, disparate-impact claims—unlike disparate-treatment claims—focus on "the consequences of actions and not just [] the mindset of actors . . . ." *Inclusive Communities*, 576 U.S. at 534.

To establish prima facie disparate impact, a plaintiff must present evidence of: "(1) the existence of a policy . . . that is outwardly neutral; (2) a significant, adverse, and disproportionate effect on a protected class; and (3) robust causality that shows, beyond mere evidence of a statistical disparity, that the challenged policy, and not some other factor or policy, caused the disproportionate effect." *S.W. Fair Hous. Council*, 17 F.4th at 962 (footnote omitted). Here, the district court concluded that Ohio House failed to

prove the second requirement—a significantly adverse or disproportionate impact on a protected group. We agree.

An FHA plaintiff must present evidence of an adverse and disproportionate impact. "[R]aising an inference of discriminatory impact is insufficient." *Gamble*, 104 F.3d at 306 (quoting *Pfaff v. Dep't of Hous. & Urb. Dev.*, 88 F.3d 739, 746 (9th Cir. 1996)). Were it otherwise, disparate-impact claims could be used to "displace valid governmental and private priorities." *Inclusive Communities*, 576 U.S. at 544.

Ohio House first argues that even if the challenged zoning regulations benefit the disabled, they nonetheless have an unlawful discriminatory effect because "[t]he City's separation requirement served to disqualify 22 of 26 group home [conditional-use-permit] applicants." Ohio House further contends that it need not present statistical evidence of disparity because the City's regulations "defined the affected classes" and the absence of any boardinghouses within the City demonstrates that enforcement of the separation requirement disproportionately impacts group homes. Ohio House is wrong on both counts.

A policy that benefits the disabled does not impose artificial and arbitrary barriers on that group. *Cf. S.W. Fair Hous.*, 17 F.4th at 962 (requiring an adverse effect to satisfy the second prong of prima facie discriminatory impact). And even if it could, by not pointing to evidence showing that the City's zoning regulations disproportionately reduced housing opportunities for disabled individuals, Ohio House cannot prove that the disabled are suffering the type of "significant, adverse, and disproportionate effect" that the FHA prohibits. *Id.* The City's denial of conditional-use permits shows that applicants seeking *to operate* group

homes are adversely impacted. But a disparate-impact claim requires proof that *the protected class*—disabled individuals—is suffering an adverse and disproportionate impact. *Id.* Ohio House infers that the disabled will suffer adverse downstream consequences if purveyors of group homes are not allowed to operate under the City's revised zoning code, but as noted, "raising an inference of discriminatory impact is insufficient." *Gamble*, 104 F.3d at 306 (quoting *Pfaff*, 88 F.3d at 746).

For the same reason, Ohio House's assertion that it is not required to present any comparative or statistical analysis to demonstrate an adverse and disproportionate effect on the disabled is unpersuasive. Ohio House argues that it can prove disparate impact facially because the challenged regulations "defined the affected classes" and there were no boardinghouses in the City. As an initial matter, there is evidence in the record that boardinghouses did exist and, therefore, are a relevant comparator.[8] *See Gamble*, 104 F.3d at 306–07 ("The relevant comparison group to determine a discriminatory effect on the . . . disabled is other groups of similar sizes living together. Otherwise, all that has been demonstrated is a discriminatory effect on group living."). Additionally, without any evidence related to how the City's revised regulations governing group-living facilities impacted disabled versus nondisabled *individuals* seeking group-living arrangements, there is no evidence upon which

---

[8] Even if it were true that there were no boardinghouses within City limits, Ohio House places too much weight on this fact. A permitting scheme impacts proposed future development as much as it affects existing facilities. If the regulations dissuaded prospective builders of boardinghouses from applying for the necessary conditional-use permits, then enforcement of the regulations may adversely affect boardinghouses.

a jury could find that these regulations have had a "significant, adverse, and disproportionate effect" on the disabled. *S.W. Fair Hous.*, 17 F.4th at 962; *Pulsifer v. United States*, 601 U.S. 124, 133, 139 (2024) (explaining that an enumeration of three requirements linked by the conjunction "and" creates "three necessary conditions").

Separate from whether Ohio House can prove the second element of the prima facie case, it has an additional problem with proving the first element. Ohio House must establish that the challenged policy is "outwardly neutral." *S.W. Fair Hous.*, 17 F.4th at 962. But here, its disparate impact theory contends that the City's zoning code is *facially discriminatory*. Ohio House concedes that the "disparate impact analysis is usually not applied to a facially discriminatory policy"; nonetheless, it incorporates its facial-discrimination theory into its disparate-impact claim, thereby failing to prove the first element.**[9]**

For these reasons, we conclude that the district court did not err in granting summary judgment for the City on Ohio House's disparate-impact claim.

---

[9] Ohio House could have *alternatively* argued that the City's zoning code is either (1) facially discriminatory or (2) facially neutral but discriminatory in its impact, *see* Fed. R. Civ. P. 8(d)(2), but that is not how it presented its disparate-impact claim. Ohio House expressly argued in support of its disparate-impact claim that it does not need to present evidence to prove "a significant, adverse and disproportionate impact," *S.W. Fair Hous.*, 17 F.4th at 962, *because the City's challenged regulations expressly "defined the affected classes.*" Ohio House's theory, which attempted to prove the second disparate-impact element with a facial discrimination allegation, defeated itself by therefore failing to allege the first element of a disparate-impact claim.

### 3.  Discriminatory Statements

Ohio House contends that it was entitled to judgment as a matter of law on its discriminatory-statements claim despite the jury's finding that the City did not make any unlawful discriminatory statements. We review the district court's denial of a motion for judgment as a matter of law de novo. *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1063 (9th Cir. 2022). Ohio House is entitled to judgment as a matter of law only if the evidence, construed in light most favorable to the City, "permits only one reasonable conclusion that is contrary to the jury's verdict." *Planned Parenthood Fed'n of Am., Inc. v. Newman*, 51 F.4th 1125, 1133 (9th Cir. 2022); *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).

It is unlawful under the FHA "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . handicap . . . , or an intention to make any such preference, limitation, or discrimination. 42 U.S.C. § 3604(c); *see also* 24 C.F.R. § 100.75(b). We have adopted "[a]n 'objective ordinary' reader" standard for determining whether a statement violates § 3604(c). *Morris*, 104 F.4th at 1148. The plaintiff must prove that "an ordinary listener would believe that [the challenged statement] suggests a preference, limitation, or discrimination based on a protected status." *Id*. (quoting *Corey v. Sec'y, U.S. Dep't of Hous. & Urb. Dev. ex rel. Walker*, 719 F.3d 322, 326 (4th Cir. 2013)). While proof of "facially discriminatory messages" is not required, *id.* at 1149, "[a] 'stray remark . . . unrelated to the decisional process' is insufficient to establish a § 3604(c) violation," *id.*

at 1150 (quoting *Harris v. Itzhaki*, 183 F.3d 1043, 1055 (9th Cir. 1999)).

California's standard under the FEHA is similar. *See* Cal. Gov't Code § 12955(c).**10** But unlike the federal housing regulations promulgated under authority granted by the FHA, *see* 24 C.F.R. § 100.75, California's regulations explicitly state that "[a] facially discriminatory policy or express statement" violates the FEHA's prohibition against discriminatory statements, Cal. Code Regs. tit. 2, § 12042(g).

Ohio House contends that the City violated the FHA's and the FEHA's prohibition against discriminatory statements by enacting a facially discriminatory zoning code. We need not decide whether a municipal regulation can trigger discriminatory-statement liability under the FHA because Ohio House's discriminatory-statements claim rises and falls with its facial disparate-treatment claim, which we have concluded fails as a matter of law. *See also Morris*, 104 F.4th at 1149 ("Merely mentioning one of the protected characteristics identified in § 3604(c), without more, does not necessarily convey a 'preference, limitation, or

_____

[10]Section 12955(c) makes it unlawful:

> For any person to make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a housing accommodation that indicates any preference, limitation, or discrimination based on race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, marital status, national origin, ancestry, familial status, source of income, disability, veteran or military status, or genetic information or an intention to make that preference, limitation, or discrimination.

discrimination' forbidden by the FHA, particularly if 'there are situations in which it is legitimate' to do so." (quoting *Soules v. U.S. Dep't of Hous. & Urb. Dev.*, 967 F.2d 817, 824 (2d Cir. 1992))).

To the extent that Ohio House relies on comments made by individual city employees suggesting that they had a discriminatory purpose for adopting the challenged zoning regulations, that alone is insufficient to overturn the jury's verdict. *See id.* ("[E]vidence of a speaker or creator's intent may be relevant insofar as it illuminates the likely understanding of the message by viewers. But the scope of § 3604(c) liability is defined by the statement's impact on the reader, viewer, or listener, not by the subjective motivations of the speaker . . . Nor is the speaker's stated intent dispositive.").

### 4. Interference with FHA Rights

Ohio House also argues that it was entitled to judgment as a matter of law on its claim that the City interfered with Ohio House aiding or encouraging others' exercise of their rights under the FHA.[11] It is unlawful under the FHA "to coerce, intimidate, threaten, or interfere with any person . . . on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [the FHA]." 42 U.S.C. § 3617. We interpret this provision broadly. *Morris*, 104 F.4th at 1143. It "reach[es]

---

[11] While Ohio House's opening brief was terse regarding this claim, the City addressed the merits and did not argue forfeiture, the City is not prejudiced by our resolution of this issue, and both the district court and the jury spent significant energy considering the causation prong of this claim. *See United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992) (noting discretion to adjudicate inadequately briefed arguments if consideration of the issues will not prejudice the appellee).

all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws." *Id.* (quoting *United States v. City of Hayward*, 36 F.3d 832, 835, 836 (9th Cir. 1994) (alteration in original)); *see also Smith v. Stechel*, 510 F.2d 1162, 1164 (9th Cir. 1975) (explaining that § 3617 is implicated when a "would-be tenant has been discouraged from asserting his rights, . . . rights have actually been respected by persons who suffer consequent retaliation," or "the fundamental inequity of a discriminatory housing practice is compounded by coercion, intimidation, threat or interference"). Despite its breadth, to prove an interference claim, the "plaintiff must show that the defendant's actions affected the 'exercise or enjoyment of . . . any right granted or protected'" by the FHA. *Morris*, 104 F.4th at 1143 (quoting 42 U.S.C. § 3617).

We apply the *McDonnell Douglas* burden-shifting framework to FHA-interference claims and first "require[] the plaintiff to establish a prima facie case by showing that (1) he was engaged in protected activity; (2) he suffered an adverse action; and (3) there was a causal link between the two." *Brown v. City of Tucson*, 336 F.3d 1181, 1192 (9th Cir. 2003) (citing *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001)). We address each of these elements in turn.

First, Ohio House established that it engaged in protected activity. The district court instructed the jury to accept as true that Ohio House engaged in protected activity by providing housing for the disabled.[12] The court also

---

[12] Ohio House argues that the district court erred by advising the jury that the FHA-interference claim was "contingent on proof of an underlying discriminatory housing practice," but it concedes that the substantive

instructed the jury "to accept as proven . . . that Ohio House
provides or intends to provide housing for persons with
disabilities." *See Walker*, 272 F.3d at 1128 (holding that a
fair housing advocacy organization had "shown that it

---

instruction identifying the elements of this claim was correct. Ohio
House also argues that the verdict form repeated the court's initial
instructional error because it "focus[ed] on the rights of the disabled" by
asking whether the City "interfered with the rights of the disabled to a
housing opportunity of their choice," rather than asking whether the City
"interfered with Ohio House . . . *because* Ohio House was engaged in
providing housing for persons with disabilities [or protected activity as
defined by the Court]." (emphasis added.) "We review for abuse of
discretion the district court's formulation of the instructions and review
de novo whether the instructions accurately state the law." *Unicolors*, 52
F.4th at 1063–64 (quoting *Skidmore ex rel. Randy Craig Wolfe Tr. v. Led
Zeppelin*, 952 F.3d 1051, 1065 (9th Cir. 2020) (en banc)). "[T]he panel
must 'consider the issued instructions as a whole,' such that 'reversal is
not warranted if the error is more probably than not harmless.'" *Id.* at
1064 (quoting *Randy Craig Wolfe*, 952 F.3d at 1065). Jury instruction
No. 33 accurately stated the law for Ohio House's "interference with fair
housing rights" claim. And "taking the verdict form and instructions
together" the FHA-interference claim "was fairly presented to the jury"
and it was "clear which theory the jury was applying." *Mangold v. Cal.
Pub. Utils. Comm'n*, 67 F.3d 1470, 1476 (9th Cir. 1995); *see also
Carvalho v. Raybestos-Manhattan Inc.*, 794 F.2d 454, 455 (9th Cir.
1986) ("If the issues are fairly presented, the district court has broad
discretion regarding the precise wording of the instructions and
interrogatories."). To the extent Ohio House claims that it was error to
allow the City to reference the verdict form in arguing at closing that it
had not "interfered with the rights of the disabled to a housing
opportunity," this argument was forfeited because Ohio House did not
object during the City's closing argument. *See Swinton v. Potomac
Corp.*, 270 F.3d 794, 816 (9th Cir. 2001) (holding that failure to make a
contemporaneous objection "subject[s] the error alleged only to the
highly deferential 'plain or fundamental error' standard of review, where
we will reverse only 'where the integrity or fundamental fairness of the
proceedings in the trial court is called into serious question'" (quoting
*Bird v. Glacier Elec. Coop.*, Inc., 255 F.3d 1136, 1148 (9th Cir. 2001))).

participated in a protected activity [by] 'aid[ing] or encourag[ing]'. . . [the protected class] in the exercise of their fair housing rights." (alterations in original) (quoting 42 U.S.C. § 3617)). And the City does not dispute that Ohio House proved this element, nor does it challenge the scope of Ohio House's protected activity on appeal.

Second, Ohio House established that it suffered "adverse action." "Interference" with the exercise of rights bestowed by the FHA is an adverse action. *Walker*, 272 F.3d at 1128–29. It is undisputed that the City took enforcement action and imposed fines against Ohio House, denied Ohio House's reasonable-accommodation request, and filed a nuisance action against Ohio House to shut down its operations because it did not have a conditional-use permit. These actions impede Ohio House's ability to provide housing for its clients and, as such, come within the FHA's broad use of term "interference." *Morris*, 104 F.4th at 1143; *see also City of Hayward*, 36 F.3d at 835.

The third element—causation—is where Ohio House has trouble. The district court did not err in concluding that Ohio House failed to prove a causal link between its protected activity of providing sober-living housing and the City's actions that impeded that activity. *Brown*, 336 F.3d at 1192.

We have explained that the manner in which plaintiffs must prove causation at the prima-facie stage turns on whether the plaintiff asserts that the defendant retaliated against plaintiff due to its activity or asserts that the defendant interfered with plaintiff's activity under § 3617 due to discriminatory intent. For example, in *Walker*, we analyzed a § 3617 retaliation claim and considered whether "an independent fair housing services provider engaged in

advocacy efforts may sue the city with whom it contracts for
retaliating against the provider in response to that
advocacy." 272 F.3d at 1120. In resolving this issue, we
considered whether the city's challenged action was taken in
response to, i.e. *because of*, the plaintiff's "protected
activity." *Id*. at 1128–30. Specifically, we considered the
temporal proximity between the plaintiff's "protected
activity" and the city's actions and explained that the
plaintiff "demonstrated the requisite causal link" partly
because the city engaged in retaliatory action "two weeks
after" it found out about plaintiff's protected activity. *Id*. at
1130. The plaintiff therefore established a prima facie case
of retaliation under § 3617. *Id.* Finally, we concluded that
even though the city "met its burden of articulating a
nonretaliatory reason for its actions," the plaintiff presented
sufficient evidence to establish a triable issue regarding its
"ultimate burden of demonstrating that the reason was
merely a pretext for a discriminatory motive." *Id*. at 1128,
1130–31.

As we explained in *Walker*, a claim based on retaliation
"is analogous to the more-familiar situation of a retaliatory
failure-to-hire in the Title VII and First Amendment
contexts." *Id*. at 1126 (first citing *Ruggles v. Cal.
Polytechnic State Univ.*, 797 F.2d 782, 786 (9th Cir. 1986)
(Title VII retaliation claim); and then citing *Mt. Healthy City
Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–84
(1977) (First Amendment retaliation claim)). And, as with
Title VII retaliatory action claims, an FHA retaliation claim
hinges on the *plaintiff's actions* that preceded the
defendant's actions. *See Wetzel v. Glen St. Andrew Living
Community, LLC*, 901 F.3d 856, 868 (7th Cir. 2018) ("Like
all anti-retaliation provisions, [§ 3617, when invoked to
pursue an FHA retaliation claim] provides protections not

because of who people are, but because of what they do.").
Simplistically, a retaliation theory asserts: because A did
this, B did that to A.

This type of temporal, cause-and-effect inquiry does not
make sense for claims based on an interference theory,
which presuppose a different causal inquiry. In this context,
to establish causation at the prima-facie stage, we focus not
on whether the defendant interfered with the plaintiff's rights
in reaction to *plaintiff's actions*, but whether the defendant
interfered because it had *discriminatory intent*.

We applied this intent-based causation standard most
recently in *Morris*. There, the plaintiffs brought an
interference claim under § 3617 when a Homeowners'
Association Board sought to prevent plaintiffs from hosting
a Christmas event both before and after they purchased their
home. 104 F.4th at 1135–38, 1142. Assessing the viability
of plaintiffs' claim, we determined that "we must review the
record for evidence that the Board's threatening,
intimidating, and interfering conduct, although it did not
preclude the [plaintiffs] from purchasing their home or
putting on their Christmas event, was driven at least in part
by a motive to disfavor the [plaintiffs'] religion." *Id*. at 1143.
That is, we had to determine whether the Board's actions
"could serve as evidence that [it] was *actually motivated*, at
least in part, by an anti-religious discriminatory purpose." *Id.*
at 1145. And we held that the plaintiffs had presented
sufficient evidence to show that the "Board interfered with
the[ir] exercise of their right to purchase and enjoy their
home at least in part because of their religious expression,
and therefore violated § 3617 of the FHA." *Id.*

"At its core, the FHA guarantees tenants and
homeowners a right to take and enjoy possession of a home

free from *discrimination* based on a protected characteristic." *Id.* at 1143 (emphasis added). And *Morris* makes clear that to establish a prima facie interference claim, the plaintiff must prove that a defendant interfered with protected activity *because of discriminatory intent*. Or stated differently, a plaintiff must prove that discriminatory intent was a partial cause of the defendant's interference. But a plaintiff "need not 'prove that the [defendant's] discriminatory purpose was the *sole* purpose of the challenged action'"; it need only be "*a* 'motivating factor.'" *Id.* at 1144 (emphasis added) (quoting *Ave. 6E*, 818 F.3d at 504).

We adopt the Seventh Circuit's approach to causation for § 3617 claims and make explicit what our decision in *Morris* suggests: Proof of intentional discrimination or discriminatory animus is required to establish a prima facie § 3617 claim based on an interference theory, but not on a retaliation theory. *Wetzel*, 901 F.3d at 868 ("Proof of discriminatory animus is not [required for retaliation claims]. [Instead,] a claim under section 3617 requires showing intentional discrimination only when considering an interference claim." (emphasis removed)); *see also Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009) ("Discriminatory intent is the pivotal element [of an interference claim]. . . . [A defendant's actions] would constitute 'interference' if it was invidiously motivated— that is, if it was intentionally discriminatory."). Again, we review the district court's denial of Ohio House's renewed motion for judgment as a matter of law de novo, *Unicolors*, 52 F.4th at 1063, but "we give significant deference to the jury's verdict and to the nonmoving part[y] . . . when deciding whether that decision was correct." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013).

Turning to Ohio House's evidence here, it relies on what it calls "admissions" that "disability was a motivating factor in the City's conduct." These include: (1) the City's 2015-2019 reports to the California Department of Housing and Community Development explaining that its goal in passing zoning ordinances regulating group housing was to "[p]rotect existing stabilized residential neighborhoods[] . . . from the encroachment of incompatible or potentially disruptive land uses and/or activities" and that it had "taken . . . action," including adopting "a Multiple Family Group Home Ordinance on November 17, 2015 to limit the number and concentration of group homes and sober living facilities in the Multiple Family Residential zones"; and (2) statements made by the City Director of Economic and Development Services that "the City had 'a proliferation of group homes and sober living homes' and that it had adopted the group home ordinances 'as a way to address the complaints' received from City residents" and that the City chose to "'spread out the group homes in the city' as an alternative to 'citing them all and shutting them down.'"

Although this evidence taken in isolation might suggest discriminatory animus, there is countervailing evidence that the City was motivated by legitimate, non-discriminatory goals.[13] In passing regulations governing group homes and

---

[13] Ohio House relies on these same "admissions" to support its "pattern or practice claim," which it has characterized in different ways throughout the litigation. Initially, in its operative complaint, Ohio House references "[t]he disparate impact of the city's pattern or practice of zoning discrimination[.]" The district court then implied in its summary judgment ruling that a "pattern or practice" claim is a distinct type of discrimination claim and stated that both Attorneys General and private plaintiffs can bring such a claim. Ultimately, in its pretrial

sober-living homes, the City explained that an "overconcentration" of group-living arrangements produced "deleterious" effects "to the residential character" of its communities and "generated secondary impacts including, but not limited to neighborhood parking shortfalls, overcrowding, inordinate amounts of second-hand smoke, and noise; and the clustering of sober living facilities in close proximity to each other creating near neighborhoods of sober living homes." The City's Economic and Development Services Director Jennifer Le echoed that "the City was concerned about changes in residential character of neighborhoods as homes transitioned to a use that was more commercial or institutional as opposed to residential" and further explained that "[g]enerally when you have a cluster of group homes or when you have higher-than-average persons per household . . . you can have increased traffic, increased parking. There tends to be increased complaints due to noise, those types of things."

Logistical and aesthetic disturbances that may arise due to changes in traffic patterns, availability of parking, and increased noise levels are legitimate concerns for any city and are central to the goals of municipal zoning. *Penn Cent.*

---

conference order, the district court correctly characterized Ohio House's "pattern or practice" theory as a "disparate treatment claim." By bringing allegations of a pattern and practice of discrimination, plaintiffs are effectively pursuing the "'direct or circumstantial evidence' approach. . . of [showing that] the defendant's actions were motivated by discriminatory intent[,]" *Pac. Shores Props*., 730 F.3d at 1158, to which we apply the *Arlington Heights* test, *id*. at 1158–59. Ohio House does not provide a discernible legal framework for reviewing its claim, much less analyze the *Arlington Heights* factors. Regardless, because Ohio House relies on the same unconvincing evidence of alleged discriminatory intent used to support its interference claim, its disparate-treatment claim based on a pattern or practice theory fails as well.

*Transp. Co. v. City of New York*, 438 U.S. 104, 129 (1978) ("States and cities may enact land-use restrictions or controls to enhance the quality of life by preserving the character and desirable aesthetic features of a city."); *Budnick v. Town of Carefree*, 518 F.3d 1109, 1116 (9th Cir. 2008) ("[A] city's interest in achieving its zoning goals has long been recognized as a legitimate governmental interest."); *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1236 (9th Cir. 1994) (recognizing as "legitimate objectives" "preserving the agricultural heritage of the City, providing for a range of housing types and densities, preserving the 'small town' character of the City, and limiting development within the City to levels consistent with available resources"); *cf. Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 54–55, 71 n.34 (1976) (plurality opinion) (upholding a 1,000-foot restriction on adult businesses when motivated by the businesses' secondary effects on surrounding communities). In fact, high-density housing of any kind may dilute the desired residential character of a neighborhood. The jury could have concluded that the City's challenged zoning regulations were intended to address these problems and did not indicate the City has discriminatory animus towards the disabled. *See Gamble*, 104 F.3d at 306 (holding that concern for the residential character of the neighborhood is a legitimate and nondiscriminatory goal). Whether the residents of high-density group-living facilities are disabled or not does not inherently dictate whether such facilities will contribute to higher traffic, lack of sufficient parking, or increased noise—those problems arise from high-density housing in and of itself, regardless of the residents. And the City's focus on group homes is not inherently suggestive of discriminatory animus given their rapid proliferation, which the City attributed to federal and state legislation that had

incentivized a "significant increase in the number of single-
and multi-family homes being utilized as alcohol and drug
recovery facilities for large numbers of individuals."

"Viewing this evidence in the light most favorable to the
[City], there is sufficient 'evidence adequate to support the
jury's conclusion'" that the City did not unlawfully interfere
with Ohio House's right to provide housing for disabled
individuals. *Morris*, 104 F.4th at 1145 (citation omitted)
(quoting *Johnson v. Paradise Valley Unified Sch. Dist.*, 251
F.3d 1222, 1227 (9th Cir. 2001)). A reasonable jury could
have concluded that the City enacted its zoning ordinances
and took enforcement action against Ohio House to pursue
legitimate municipal goals. *See Reed v. Lieurance*, 863 F.3d
1196, 1211 (9th Cir. 2017) ("[J]udgment as a matter of law
is appropriate when the evidence presented at trial permits
only one reasonable conclusion." (quoting *Torres v. City of
Los Angeles*, 548 F.3d 1197, 1205 (9th Cir. 2008))). The
district court's explanation for why it properly denied Ohio
House's motion is exactly right:

> [L]ike Ohio House's other arguments
> regarding discrimination, [its interference
> claim] fails. Th[e] evidence does not compel
> only one conclusion, i.e., that the City denied
> Ohio House's applications because it was a
> sober living home servicing disabled persons.
> The jury could have inferred that . . . the
> denial of the permits [was] based simply on
> the fact that Ohio House did not meet the
> 650-foot separation requirement to operate
> within the residential zone of its choosing.
> The jury had sufficient evidence to conclude
> that [the] City took adverse action against

> Ohio House because it had not met the
> requirements under the City's regulation, not
> because it was a sober living home or because
> its residents were disabled. Nor did Ohio
> House produce any other evidence that the
> City's denial was pretext for its "real"
> discriminatory intent.

Accordingly, we affirm the district court's denial of Ohio
House's renewed motion for judgment as a matter of law on
its interference claim.

### 5. Reasonable Accommodation

Below, Ohio House raised a facial challenge to the City's
reasonable-accommodation ordinance, *see* CMMC §§ 13-
200.60 to 13-200.63, argued that it was unlawfully denied an
accommodation, and moved for summary judgment on this
claim. Ohio House correctly notes that the district court
failed to decide the purely legal issue presented by Ohio
House's facial challenge and instead submitted the entirety
of the reasonable-accommodation claim to the jury.
Nonetheless, again, it was harmless error to submit this
claim to the jury if the jury ultimately reached the correct
outcome. *Minneapolis & Saint Louis Ry. Co.*, 119 U.S. at
152.

After the jury found that the City did not "unlawfully
refuse to make a reasonable accommodation," the district
court denied Ohio House's motion for judgment as a matter
of law. It concluded that the jury lawfully could have found
that the requested accommodation was unreasonable
because it was unnecessary for disabled individuals to be
able to reside in the dwelling of their choosing and because

the separation requirement was fundamental to the City's zoning scheme.

Although Ohio House asserted its reasonable-accommodation claim under both the FHA and the FEHA, it forfeited reliance on the FEHA on appeal. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[W]e cannot 'manufacture arguments for an appellant' and therefore we will not consider any claims that were not actually argued in appellant's opening brief." (quoting *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994))); *see also D.A.R.E. America v. Rolling Stone Mag.*, 270 F.3d 793, 793 (9th Cir. 2001) ("A bare assertion of an issue does not preserve a claim."). Ohio House did not provide any meaningful legal authority or argument related to the FEHA on this claim. The only state law that Ohio House referenced that implicates the FEHA is California Government Code § 12955.6, which simply states that nothing in the FEHA should be interpreted in a way that affords less rights than the FHA.[14] Therefore, we analyze this claim only under the FHA.

Unlawful discrimination under the FHA includes "a refusal to make reasonable accommodations in rules [or] policies . . . when such accommodations may be necessary to afford [the disabled] equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). We first consider Ohio House's argument that federal law preempts CMMC § 13-200.62(f)(7) as a facial matter, and then turn to whether

---

[14] Although Ohio House cited an immaterial provision of the FHA, it offers sufficient caselaw and argument to preserve its challenge under this statute.

the City was required to waive enforcement of the separation requirement as a reasonable accommodation.

### a. CMMC § 13-200.62(f)(7)

"[A] plaintiff cannot succeed on a facial challenge unless [it] 'establish[es] that no set of circumstances exists under which the [law] would be valid,' or [it] shows that the law lacks a 'plainly legitimate sweep.'" *Moody*, 144 S. Ct. at 2397 (quoting *Salerno*, 481 U.S. at 745 (third and fourth alterations in original)). We begin our analysis by determining the scope of the challenged law. *See id.* at 2398. We then determine "which of the laws' applications violate [the FHA] and . . . measure them against the rest [of the lawful applications]." *Id.*

The City's reasonable-accommodation regulation gives anyone seeking zoning approval related to housing and other facilities that "substantially serve persons with disabilities" the right to apply for reasonable accommodation from regulations or policies that impose "a barrier to equal opportunity for housing." CMMC § 13-200.61. This portion of the regulation reads in full:

> Any person seeking approval to construct and/or modify residential housing for person(s) with disabilities, and/or operate a residential care facility, group home, or referral facility, which will substantially serve persons with disabilities may apply for a reasonable accommodation to obtain relief from a Zoning Code provision, regulation,

> policy, or condition which causes a barrier to
> equal opportunity for housing.

CMMC § 13-200.61. Whether a reasonable accommodation
may be granted depends on whether it is *necessary* to give
the disabled "an equal opportunity to use and enjoy a
dwelling," and whether it is *reasonable*. *Id.* § 13-
200.62(e)(1)-(2). The regulation provides that an
accommodation is not reasonable if it "impose[s] an undue
financial or administrative burden on the City" or "if it
would fundamentally alter a City program, such as the City's
zoning scheme." *Id.* The regulation defines the procedures
that must be followed in seeking an accommodation,
including the "findings" that the City must make before
granting the requested accommodation or an "alternative
reasonable accommodations which provide an equivalent
level of benefit to the applicant. CMMC § 13-200.62(f).**15**

---

[15] The required findings are as follows:

> (1) The requested accommodation is requested by or
> on the behalf of one or more individuals with a
> disability protected under the fair housing laws.
> (2) The requested accommodation is necessary to
> provide one or more individuals with a disability an
> equal opportunity to use and enjoy a dwelling.
> (3) The requested accommodation will not impose an
> undue financial or administrative burden on the city,
> as "undue financial or administrative burden" is
> defined in fair housing laws and interpretive case law.
> (4) The requested accommodation is consistent with
> surrounding uses in scale and intensity of use.
> (5) The requested accommodation will not, under the
> specific facts of the case, result in a direct threat to the

The regulation comprehensively covers the right to seek, and the requirements for obtaining, a reasonable accommodation from the City's zoning rules to ensure disabled persons realize their right to equal access to housing.

Taken as a whole, the City's reasonable-accommodation regulation is not inconsistent with the FHA. Indeed, Ohio House challenges only one specific subsection that requires the City to consider "[w]hether the existing supply of facilities of a similar nature and operation in the community is sufficient to provide individuals with a disability an equal opportunity to live in a residential setting." CMMC § 13-200.62(f)(7). Ohio House argues that this subsection facially violates the FHA because that Act "protects the right of individuals to live in the residence of their choice in the community, not in a location the City might choose." According to Ohio House, "the availability of another

---

health or safety of other individuals or substantial physical damage to the property of others.

(6) If economic viability is raised by the applicant as part of the applicant's showing that the requested accommodation is necessary, then a finding that the requested accommodation is necessary to make facilities of a similar nature or operation economically viable in light of the particularities of the relevant market and market participants generally, not just for that particular applicant.

(7) Whether the existing supply of facilities of a similar nature and operation in the community is sufficient to provide individuals with a disability an equal opportunity to live in a residential setting.

(8) The requested accommodation will not result in a fundamental alteration in the nature of the City's zoning program.

*Id.*

dwelling somewhere within a city's boundaries is irrelevant to a municipality's duty to make reasonable accommodations."

In *Giebeler v. M & B Associates*, we stated that the "specific goals" of the FHA's reasonable-accommodation provisions were "to protect the right of handicapped persons to live in the residence *of their choice* in the community," and "to end the unnecessary exclusion of persons with handicaps from the American mainstream." 343 F.3d 1143, 1149 (9th Cir. 2003) (emphasis added) (quoting *City of Edmonds v. Wash. State Bldg. Code Council*, 18 F.3d 802, 806 (9th Cir. 1994)). Although subsection 13-200.62(f)(7) uses more permissive language than the other subsections describing the findings that the City must make,[16] the City is nevertheless "required" to resolve requests for accommodations in part "on . . . the existing supply of facilities of a similar nature and operation in the community." CMMC § 13-200.62(f)(7). Thus, Ohio House is correct that the City's reasonable-accommodation regulation requires it to consider the availability of alternative housing.

However, Ohio House's facial challenge to subsection 13-200.62(f)(7) fails. It is not clear that the finding the City is required to make under subsection 13-200.62(f)(7) conflicts with the FHA's "specific goal" of "protect[ing] the

---

[16] Unlike other enumerated provisions, subsection (f)(7) does not require a finding that "[t]he requested accommodation *is*" one that meets a specified criterion, *e.g.*, subsection (f)(2) (emphasis added), or that it "*will not*" have a certain effect, *e.g.*, subsection (f)(5) (emphasis added). Rather, subsection (f)(7) requires a finding as to "[*w*]*hether* the existing supply of facilities of a similar nature and operation in the community is sufficient to provide individuals with a disability an equal opportunity to live in a residential setting"

right of handicapped persons to live in the residence *of their choice . . . .*" *Giebeler*, 343 F.3d at 1149 (emphasis added) (quoting *City of Edmonds*, 18 F.3d at 806), such that obstacle preemption applies. *City of Los Angeles v. AECOM Servs., Inc.*, 854 F.3d 1149, 1159 (9th Cir. 2017) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). The City need not give that required finding any weight in assessing a request for reasonable accommodation and the reasoning in *Giebeler* may not apply the same to the situation here where a group-home operator is suing based on limitations imposed on its ability to operate a facility due to the presence of existing facilities, as opposed to a disabled individual seeking occupancy. *See Moody*, 144 S. Ct. at 2397 (to establish obstacle preemption, the plaintiff must establish "that no set of circumstances exists under which the [law] would be valid, or . . . shows that the law lacks a plainly legitimate sweep").

But even if Ohio House were correct that CMMC § 13-200.62(f)(7) is preempted by the FHA, that does not mean that the City's entire reasonable-accommodation regulation fails. *See Hamad v. Gates*, 732 F.3d 990, 999 (9th Cir. 2013) ("As a general rule, courts are to 'refrain from invalidating more of [a] statute than is necessary,' because '[a] ruling of unconstitutionality frustrates the intent of the elected representatives.'" (alterations in original) (citation omitted) (first quoting *United States v. Booker*, 543 U.S. 220, 258 (2005); and then quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006))). Rather, we consider whether the inconsistent provisions can viably be severed. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) ("'Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem,' severing any 'problematic

portions while leaving the remainder intact.' Because '[t]he unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions,' the 'normal rule' is 'that partial, rather than facial, invalidation is the required course.'" (alteration in original) (citations omitted)). And consistent with principles of federalism, "'[s]everability of a local ordinance is a question of state law.'" *Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 574 (9th Cir. 2014) (alteration in original) (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 772 (1988)).

California law mandates two inquiries. First, we must consider whether the challenged law includes a severability clause. *Cal. Redev. Ass'n v. Matosantos*, 267 P.3d 580, 607 (Cal. 2011). A severability clause "establishes a presumption that the Legislature intended that the invalid . . . applications be severed from the valid . . . ones." *Friends of the Eel River v. N. Coast R.R. Auth.*, 399 P.3d 37, 76 (Cal. 2017); *see also Matosantos*, 267 P.3d at 607. Though "not conclusive," this presumption weighs heavily in favor of severance. *Santa Barbara Sch. Dist. v. Super. Ct.*, 530 P.2d 605, 618 (Cal. 1975) (in bank) (quoting *McCafferty v. Bd. of Supervisors*, 83 Cal. Rptr. 229, 231 (Cal. Ct. App. 1969)). And second, we must consider whether the invalid provision is "grammatically, functionally, and volitionally separable." *Matosantos*, 267 P.3d at 607 (quoting *Calfarm Ins. Co. v. Deukmejian*, 771 P.2d 1247, 1256 (Cal. 1989)). All three of these separability criteria "must be satisfied" before an invalid provision can be severed. *McMahan v. City & County of San Francisco*, 26 Cal. Rptr. 3d 509, 513 (Cal Ct. App. 2005). "Grammatical separability, also known as mechanical separability, depends on whether the invalid parts 'can be removed as a whole without affecting the wording' or coherence of what remains." *Matosantos*, 267

P.3d at 607 (quoting *Calfarm Ins. Co*., 771 P.2d at 1256). Relatedly, "[f]unctional separability depends on whether 'the remainder of the statute "is complete in itself."'" *Id*. at 608 (quoting *Sonoma Cnty. Org. of Pub. Emps. v. Cnty. of Sonoma*, 591 P.2d 1, 14 (Cal. 1979) (in bank)). "Volitional separability depends on whether the remainder 'would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute.'" *Matosantos*, 267 P.3d at 608 (quoting *Santa Barbara Sch. Dist.*, 530 P.2d at 618). Volitional separability is the "the 'most important' factor in the severability analysis." *Acosta v. City of Costa Mesa*, 718 F.3d 800, 817 (9th Cir. 2013) (quoting *Katz v. Children's Hosp. of Orange Cnty.*, 28 F.3d 1520, 1531 (9th Cir. 1994)).

Here, both required inquiries would counsel in favor of severing subsection 13-200.62(f)(7). The City's reasonable-accommodation regulation contains a severability clause, which states that the validity of the regulation "shall not be affected" if "any section, subsection, clause, or provision of this article for any reason be held to be invalid . . ." CMMC § 13-200.63. Moreover, both grammatical and functional separability are established because subsection 13-200.62(f)(7) is a separate, enumerated provision that can be cleanly severed without disrupting the syntax or meaning of any other sections of the regulation; importantly, the regulation, including the other seven required findings, remains fully functional. *See generally* CMMC § 13-200.62. And in addition to the explicit expression of legislative intent found in the severability provision, the regulation's purpose provision states that "[i]t is the city's policy to provide reasonable accommodation in accordance with federal and state fair housing laws." CMMC § 13-200.60. This unmistakably indicates that in passing its reasonable-accommodation regulation, the City sought to comply with

both state and federal housing laws. Thus, we conclude that the City would have adopted this regulation even if it had "foreseen" that subsection 13-200.62(f)(7) would be found invalid. *Matosantos*, 267 P.3d at 608.

For the foregoing reasons, we reject Ohio House's facial challenge to subsection 13-200.62(f)(7).

### b. Ohio House's Reasonable-Accommodation Application

Ohio House argues the City erroneously relied on its subsection § 13-200.62(f)(7) finding in denying Ohio House's requested accommodation. But that was not the City's sole ground for denying the accommodation, so we evaluate Ohio House's additional challenge to the City's assertion that it was not obligated to grant an exception to its separation requirement because doing so would fundamentally alter its zoning scheme.

As indicated above, "[a] municipality commits discrimination under the [FHA] if it refuses 'to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [the disabled] equal opportunity to use and enjoy a dwelling.'" *Budnick*, 518 F.3d at 1119 (quoting *Gamble*, 104 F.3d at 307); *see* 42 U.S.C. § 3604(f)(3)(B). Public agencies have "an 'affirmative duty' . . . to reasonably accommodate disabled individuals by modifying administrative rules and policies," including zoning ordinances. *McGary v. City of Portland,* 386 F.3d 1259, 1264 (9th Cir. 2004). The scope of this duty is "highly fact-specific, requiring case-by-case determination." *United States v. Cal. Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1380 (9th Cir. 1997) (quoting *United States v. Cal. Mobile Home Park Mgmt. Co.*, 29 F.3d 1413, 1418 (9th Cir. 1994)). To prevail on a reasonable-

accommodation claim, a plaintiff must prove: "(1) that the plaintiff or his associate is handicapped within the meaning of 42 U.S.C. § 3602(h); (2) that the defendant knew or should reasonably be expected to know of the handicap; (3) that accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that defendant refused to make the requested accommodation." *Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006).

Here, there is no dispute that Ohio House established elements one, two, and five. Likewise, although the district court made conflicting statements regarding element three, it ultimately concluded that Ohio House's requested accommodation was necessary, and the City did not challenge that decision. Thus, we have no occasion to address this issue given how the case was presented to us. *See Freedom from Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132, 1152 (9th Cir. 2018) (holding that unraised arguments are forfeited).

That leaves the fourth element—whether Ohio House's requested accommodation was reasonable. The district court concluded that in light of the evidence presented "the jury could have concluded that granting the request could have constituted a fundamental change in the City's zoning scheme and thus the accommodation was unreasonable." This was not error.

Municipalities are not required "to make 'fundamental' or 'substantial' modifications to accommodate the handicapped . . . ." *Sanghvi v. City of Claremont,* 328 F.3d 532, 538 (9th Cir. 2003) (quoting *City of Edmonds*, 18 F.3d

at 806). They are required only to make reasonable accommodations. *Id.* "[A]n accommodation is reasonable . . . 'when it imposes no "fundamental alteration in the nature of the program" or "undue financial or administrative burdens."'" *Giebeler*, 343 F.3d at 1157 (quoting *Howard v. City of Beavercreek*, 276 F.3d 802, 806 (6th Cir. 2002)). Recognizing the case-specific nature of a reasonable-accommodation analysis, FHA regulations intentionally provide little guidance on how to determine the reasonableness of an accommodation or the need for a particular rule in a zoning scheme. *See Schwarz v. City of Treasure Island,* 544 F.3d 1201, 1220 n.12 (11th Cir. 2008) (first citing 42 U.S.C. § 3610(g)(2)(C); and then citing Fair Housing Amendments Act of 1988, 54 Fed. Reg. 3232, 3246 (Jan. 23, 1989)); *see also Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002) ("Whether a requested accommodation is reasonable or not . . . requires balancing the needs of the parties."). The Eleventh Circuit's survey of the caselaw from the Supreme Court and our sister circuits in *Schwarz v. City of Treasure Island* provides helpful guidance:

> Whether a particular rule is "essential" to a zoning scheme will, of course, turn on the facts of each case, but a few general principles guide us. The basic purpose of zoning is to bring complementary land uses together, while separating incompatible ones. *See Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388 (1926) ("A nuisance may be merely a right thing in the wrong place, like a pig in the parlor instead of the barnyard."). Thus, ordering a municipality to waive a zoning rule ordinarily would cause a

> "fundamental alteration" of its zoning
> scheme if the proposed use was incompatible
> with surrounding land uses. *See Bryant
> Woods Inn, Inc. v. Howard Cnty.*, 124 F.3d
> 597, 604 (4th Cir. 1997) ("In determining
> whether the reasonableness requirement has
> been met, a court may consider . . . the extent
> to which the accommodation would
> undermine the legitimate purposes and
> effects of existing zoning regulations . . . .").
> On the other hand, if the proposed use is quite
> similar to surrounding uses expressly
> permitted by the zoning code, it will be more
> difficult to show that a waiver of the rule
> would cause a "fundamental alteration" of
> the zoning scheme. Similarly, if the
> municipality routinely waives the rule upon
> request, it will be harder to show that the rule
> is "essential."

544 F.3d 1201, 1221 (11th Cir. 2008).

Applying these general principles to the facts of this
case, the jury had an evidentiary basis on which to find that
Ohio House's requested accommodation was unreasonable
because it would cause a "fundamental alteration" of the
City's zoning scheme. As previously explained, there is
evidence in the record that the City enacted its challenged
regulations governing group homes located in residential
zones out of concern about "overconcentration of sober
living units in any area" and to ensure that "disabled persons
recovering from addiction can reside in a comfortable
residential environment versus in an institutional setting."
The jury could have reasonably concluded that the

separation requirement from which Ohio House sought an exception is fundamental to achieving these goals. *Giebeler*, 343 F.3d at 1157. Indeed, Ohio House does not dispute the importance of the separation requirement to the City's zoning scheme. Instead, it contends that this "categorical and rigid rule[]" from which the City refuses to grant any accommodation is inherently at odds with the City's obligation to conduct an "'individualized inquiry' to determine whether the requested accommodation [is reasonable]."

As support, Ohio House cites a Sixth Circuit case for the principle that "making an exception to a zoning scheme to permit something that would normally be forbidden [does not] automatically amount[] to a fundamental alteration." *Anderson v. City of Blue Ash*, 798 F.3d 338, 363 (6th Cir. 2015). At issue in *Anderson* was whether a disabled individual should be granted an accommodation from an animal restriction applicable in residential zones. *Id.* at 346. In rejecting the City's argument that it was entitled to summary judgment on the basis that the accommodation was unreasonable as a matter of law, the court noted that "[w]hile protecting public health and property values are central to the City's interests," there was evidence that one otherwise disallowed animal would "not create unsanitary conditions or devalue her neighbors' property." *Id.* at 363.

*Anderson* is distinguishable from the present case in which we are reviewing a jury verdict. Unlike the one-off request in *Anderson* for an exception to an animal restriction, here Ohio House ultimately disputes as unlawful the City's denial of permits for over 20 *existing* group homes located in residential zones. As previously stated, although "routinely waiv[ing]" a specific zoning requirement suggests that it is not fundamental to a municipality's land-

use policy, *Schwarz,* 544 F.3d at 1221, the jury here reasonably could have found that the separation requirement is fundamental to the City's zoning policy governing residential areas. Thus, the jury reasonably applied the principle recognized in *Schwarz* that "ordering a municipality to waive a zoning rule ordinarily would cause a 'fundamental alteration' of its zoning scheme if the proposed use was incompatible with surrounding land uses." *Id* (citing *Bryant Woods Inn*, 124 F.3d at 604).

For all these reasons, we affirm the district court's denial of judgment as a matter of law on Ohio House's reasonable accommodation claim.

## B.  California Govt. Code § 65008 Claim

Finally, Ohio House claims that the district court erred in denying its post-trial renewed motion for judgment as a matter of law on its claim under Cal. Govt. Code § 65008(a). Section 65008(a) provides that any action by a city "is null and void" if it denies any individual or group of individuals "the enjoyment of residence, landownership, tenancy, or any other land use in this state" because of a protected characteristic under the FEHA. The district held that Ohio House's suit under this provision is time-barred by the statute of limitations set forth in Cal. Govt. Code § 65009(c)(1), which requires claims to be brought "within 90 days after the legislative body's decision" to adopt or amend a zoning ordinance or to enforce conditions attached to land-use permits. *See Cnty. of Sonoma*, 118 Cal. Rptr. 3d at 919 n.4. Ohio House disagrees, arguing that § 65009(c)(1)'s 90-day period is "applicable only to challenges to local zoning decisions" and not "to Ohio House's broader cla[i]m of discrimination based on 'administration of ordinances pursuant to any law." Cal.

Govt. Code § 65008 (b)(1)(B)(ii). As the district court
explained, "Ohio House argues that it is not challenging a
'decision' governed by § 65009," namely the Ordinances'
enactment and the denial of its conditional use-permit, "but
rather 'the exercise of municipal code enforcement power to
cite, fine, and compel the closure of a dwelling.'"

"We review a district court's determination of the
applicable statute of limitations de novo." *Stanley v. Trustees
of Cal. State Univ.*, 433 F.3d 1129, 1134 (9th Cir. 2006). And
we agree with the district court that Ohio House's claim is
subject to § 65009's 90-day limitations period. Despite Ohio
House's contentions to the contrary, it is effectively
challenging the City's zoning ordinances on their face based
on alleged defects in the ordinances themselves. *See Cnty. of
Sonoma*, 118 Cal. Rptr. 3d at 924–25 (explaining that despite
plaintiff's claim that it was making a facial and as-applied
challenge, its claim was truly "facial in nature," because it
was based on an "alleged defect . . . in the [o]rdinance itself,
not in the manner or circumstances in which it [was] being
applied."). Ohio House seeks an injunction enjoining
enforcement of the City's zoning ordinances and a
declaration that the ordinances "are invalid and void
pursuant to the Fair Housing Act and Fair Employment and
Housing Act." This is a challenge to the facial validity of an
ordinance, not an as-applied challenge of a final adjudicatory
decision triggering its own 90-day statutory limitations
period. Cal. Govt. Code § 65009(c)(1)(E).

Ohio House provides no legal or factual support for its
theory that the City's "administration" of ordinances is
something other than a facial challenge or an as-applied
challenge of a "final adjudicatory decision." Indeed, Ohio
House does not point to anything other than the ordinances
themselves as a source of purported injury. *See San Diego*

*Unified Sch. Dist. v. Yee*, 241 Cal. Rptr. 3d 896, 906 (Cal. Ct. App. 2018) (explaining that plaintiffs were "in substance and effect" challenging "the constitutionality of the . . . statutes themselves" by challenging actions that were "compelled by and taken under the . . . statutes"). Ordinance 17-06, adopted on May 2, 2017, is the most recent law that Ohio House challenges. Because Ohio House filed its initial complaint on September 6, 2019, well after the applicable 90-day statute of limitations period set forth in § 65009, it is time-barred from asserting its § 65008(a) claim.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the City on Ohio House's disparate-impact claim and its denial of judgment as a matter of law on all other claims.[17] To the extent there were errors in the district court's submission of claims to the jury and in its jury instructions, we conclude that they were harmless and do not warrant a new trial.

**AFFIRMED.**

---

[17] Ohio House's Motions for Judicial Notice, Dkts. 18, 54, are granted.

IKUTA, Circuit Judge, specially concurring:

I generally concur in the majority opinion, but would hold that in order to establish a facial disparate treatment claim under the Fair Housing Act (FHA) and Fair Employment and Housing Act (FEHA), a plaintiff must show that the protected group suffered *unfavorable* treatment compared to the unprotected group, not merely show that a protected group has been treated *differently* than an unprotected group. *See* Maj. Op. 21. Because Ohio House failed to make such a showing, it did not establish a prima facie case of disparate treatment.

It has long been the rule that to prove disparate treatment, the plaintiff must show that the defendant intended to have an adverse effect on the protected group. *See Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (stating standard under Title VII); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to *disadvantageous* terms or conditions of employment . . . ." (emphasis added) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring))); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) ("No one doubts that the term 'discriminate against' [in Title VII] refers to distinctions or differences in treatment *that injure* protected individuals." (emphasis added)). Conc. 66–67. The Supreme Court has recently confirmed this longstanding rule, stating: "The words 'discriminate against,' we have explained, refer to 'differences in treatment that injure' employees." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (quoting *Bostock v. Clayton Cnty.*, 590 U.S. 644, 681 (2020)).

Ninth Circuit precedent is consistent with this Supreme Court rule, stating that a plaintiff alleging disparate treatment (that is, intentional discrimination) may "produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant and that the defendant's actions *adversely affected* the plaintiff in some way." *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013) (cleaned up) (emphasis added). And as we explained in *Community House, Inc. v. City of Boise*, "[a] facially discriminatory policy is one which on its face applies *less favorably* to a protected group." 490 F.3d 1041, 1048 (9th Cir. 2007) (emphasis added).

We have expanded the standard for showing disparate treatment in the Fair Housing Act context. Under our approach, if the plaintiff has been subject to "intentional differential treatment" compared to an unprotected group, "a defendant must show either: (1) that the restriction benefits the protected class or (2) that it responds to legitimate safety concerns raised by the individuals affected, rather than being based on stereotypes." *Cmty. House, Inc*., 490 F.3d at 1050. In other words, if the plaintiff challenges a policy that facially applies less favorably to a protected group, the defendant may still justify the policy by proving that under the facts of that particular case, the difference is beneficial to the protected class. *See id.* For instance, in *Community House*, the City of Boise argued that despite the plaintiff's claim that Boise's policy adversely affected women by not allowing them to take advantage of men-only shelters, the policy "benefits women and families by protecting their safety." *Id.* at 1051–52. The evidence establishing a beneficial effect of a facially discriminatory, adverse rule

can defeat an FHA claim, even if it did not in *Community House* itself. *See id.* at 1051.[1]

Here, the district court concluded that because the City's zoning regulations treated group homes and sober living homes differently from boardinghouses, Ohio House established a prima facie claim of facial discrimination. But this conclusion was wrong: although Ohio House established that the relevant ordinances treated Ohio House and boardinghouses differently, Ohio House failed to prove that the treatment was less favorable, and therefore discriminatory. To the contrary, group homes and sober living homes get more favorable treatment than boardinghouses. Under the relevant zoning regulations, small boardinghouses (those with two rooms or fewer) may operate in multi-family residential districts (MFR zones), subject to a 650-foot separation requirement. Costa Mesa Municipal Code (CMMC) § 13-30 (tbl. n.4). Large boardinghouses (those with three to six rooms) may operate in MFR zones with a conditional-use permit (CUP), subject to a 1,000-foot separation requirement. *Id.* (tbl. n.5). Group homes and sober living homes seeking to operate in MFR zones must obtain different permits. *Id.* (tbl. nn.7 & 7.1). Maj. Op. 11–12. But this does not mean that boardinghouses get more favorable treatment than group home or sober

---

[1] The FEHA similarly focuses on adverse action, providing that a facially discriminatory policy is one "that explicitly conditions a housing opportunity on a protected basis, requires or allows *adverse action* based on a protected basis, or directs *adverse action* to be taken based on a protected basis." 2 C.C.R. § 12040(c) (emphases added). And, similar to the *Community House* framework, a defendant can avoid liability for a facially discriminatory policy by showing the policy "[o]bjectively benefits a protected class" and "is the least restrictive means of achieving the identified purpose." *Id.* § 12042(f).

living homes, because such homes may elect to classify themselves as boardinghouses and receive all the benefits accorded to boardinghouses. Maj. Op. 25–26. Therefore, I would reverse the district court's holding that Ohio House established a prima facie claim of facial discrimination.

Although I would hold that Ohio House failed to make a prima facie showing of discrimination, I nevertheless agree with the majority that Ohio House's disparate treatment claim fails because the differential treatment imposed benefits the protected class. Maj. Op. 23. For instance, under the ordinances, if a group home has six or fewer residents, it can operate in a single-family zoning district (R1 zone) if it obtains a special-use permit. CMMC § 13-311. And if a sober living home has six or fewer residents, it can operate in an R1 zone if it obtains a special-use permit and complies with a 650-foot separation requirement. *Id.* § 13-311(a)(14)(i). By contrast, boardinghouses are categorically prohibited from operating in R1 zones. *Id.* § 13-30 (tbl. nn.4 & 5). Maj. Op. 11. Moreover, unlike boardinghouses, a group home or sober living home can operate in an Institutional and Recreational zone as a matter of right. *Id.* § 13-30 (tbl. nn.4, 5, 7, & 7.1). Given that a group home or sober living home is entitled to all the benefits of a boardinghouse plus additional rights, it is clear that the City's ordinances do not disadvantage the group home or sober living home. Therefore, I concur in the majority.

FORREST, Circuit Judge, concurring:

I agree with Judge Ikuta that under Supreme Court precedent, a plaintiff must prove *adverse* differential treatment to establish discrimination. *See, e.g.*, *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 ("The words 'discriminate against,' we have explained, refer to 'differences in treatment that injure' employees." (quoting *Bostock v. Clayton Cnty.*, 590 U.S. 644, 681 (2020))); *cf. Gamble v. City of Escondido*, 104 F.3d 300, 304 (9th Cir. 1997) ("We apply Title VII discrimination analysis in examining [FHA] discrimination claims."). I also agree that, because adversity is part of discriminatory treatment, a plaintiff should be required to show that facially differential treatment was adverse as part of its prima-facie case. *See Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale*, 46 F.4th 1268, 1274–79 (11th Cir. 2022); *Prima Facie Case*, Black's Law Dictionary (12th ed. 2024) (a prima facie case requires enough evidence to "rule in the party's favor"). But for the reasons described in the majority opinion, I cannot read *Community House, Inc. v. City of Boise*, 490 F.3d 1041 (9th Cir. 2007), as requiring a prima facie showing of *unfavorable* treatment. *See* Maj. Op. at 21. That is where I respectfully disagree with Judge Ikuta.

That leaves the question of how to handle this tension between our precedent and Supreme Court precedent. The Supreme Court had long espoused an adversity requirement for facial discrimination when *Community House* was decided. *See Muldrow*, 601 U.S. at 354 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998), for the proposition that discrimination implies disadvantageous treatment); *Bostock*, 590 U.S. at 657 (same, citing *Burlington N. & Santa Fe R. Co. v. White*, 548 U.S. 53, 59

(2006)). Accordingly, even though the Supreme Court has continued to reiterate that differential treatment must be adverse to be discriminatory, *id.*, its recent espousals of that rule are not "intervening" decisions that "undercut the theory or reasoning underlying" *Community House* such that we are free to depart from that opinion. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc); *Dahlia v. Rodriguez*, 689 F.3d 1094, 1104 (9th Cir. 2012), *reversed on other grounds*, 735 F.3d 1060 (en banc) (reservations about a prior panel's application of existing Supreme Court precedent is not grounds under *Gammie* to revisit that panel's decision). To the extent *Community House* got the law wrong under Supreme Court precedent, it was just as wrong when it was decided as it is now. I thus conclude that in deciding this case we are compelled to apply *Community House*'s burden-shifting framework as written until the en banc court corrects our error or the Supreme Court issues intervening authority that permits departure from *Community House*.

GOULD, Circuit Judge, dissenting in part with respect to Part II.A.4:

Rather than reach the merits by holding that Plaintiff did not demonstrate discriminatory intent, I would have dismissed the plaintiff's interference claim under the FHA as waived for lack of adequate briefing. *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994). I believe the majority misconstrues the existing law with respect to the interference claim by instead holding that the plaintiff must demonstrate intentional discrimination or discriminatory animus to prove the third element of the *McDonnell Douglas* framework: causation. Op. at 37, 40.

The majority relies on *Morris*, which held that plaintiffs succeeded on an interference claim where statements by the Homeowners' Association Board "sufficiently support[ed] an inference by the jury that an anti-Christian purpose was at least *a* motivating factor in the Board's conduct." *Morris v. W. Hayden Ests. First Addition Homeowners Ass'n*, 104 F.4th 1128, 1145 (9th Cir. 2024) (emphasis in original). However, the plaintiffs in *Morris* did not use the *McDonnell Douglas* framework to prove their interference claim; rather, the plaintiffs produced circumstantial evidence that a discriminatory purpose motivated the defendant as an alternative to the *McDonnell Douglass* framework. *Id.* at 1140 ("The *McDonnell Douglas* framework, however, is only one way of establishing a disparate treatment claim…the Morrises may prevail by otherwise producing direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant and that the defendant's actions adversely affected them in some way.") (cleaned up).

The Court in *Morris* employed the *Arlington Heights* inquiry, which is an alternative to the *McDonnell Douglass* framework, not merely an element of that framework. *Id.* at 1144 (citing to *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013) and *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016), both of which describe the alternative *Arlington Heights* inquiry); *see also* Op. at 18–19 (describing the *Arlington Heights* inquiry as an alternative way to prove disparate treatment). By conflating the *Arlington Heights* requirement for discriminatory intent with the *McDonnell Douglas* framework, the majority opinion does not "make explicit what our decision in Morris suggests," but instead raises the burden on plaintiffs to prove interference under the FHA. Op. at 40. Because this portion of the decision is contrary to our precedent, I respectfully dissent.